UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KIM A. CHAMPION,

                                        Plaintiff,

                    -v-

NEW YORK STATE OFFICE OF
PARKS, RECREATION AND
HISTORIC PRESERVATION,

                                        Defendant.

18 Civ. 4955 (PAE) (KHP)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

This case involves claims of gender and race discrimination by the New York State
Office of Parks, Recreation and Historical Preservation ("Parks").  Plaintiff Kim A. Champion
alleges that Parks, in denying her promotions she sought, discriminated against her on the basis
of race and gender and retaliated against her in violation of Title VII of the Civil Rights Act
of 1964 ("Title VII"), as amended 42 U.S.C. § 2000e *et seq.*  Parks now moves for summary
judgment on all of Champion's claims.  For the reasons that follow, the Court grants Parks'
motion for summary judgment in its entirety.

## I.    Background

Champion has been a Recreation Activity Specialist at Denny Farrell Riverbank State
Park ("Riverbank") since 1993, working in Riverbank's Athletic Complex.  Her claims of
discrimination arise from two unsuccessful promotion applications: in 2016, to a post in the
Athletic Complex at the Roberto Clemente State Park ("Roberto Clemente") in the Bronx; and in
2017, to a post in the Athletic Complex at Riverbank.  Champion also alleges that Parks
retaliated against her for comments she made in 2014, 2016, and 2017 regarding Parks' failure to
promote women.

### A.     Factual Background[1]

#### 1.     Parks' Organization and Policies

Parks is headquartered in Albany, New York and is divided into regions, including the New York City region.  Parks 56.1 ¶ 1.  Parks' Human Resources Bureau ("Human Resources") is based in Albany.  Lee Decl. ¶ 4.  Parks maintains a personal-history file for each employee which includes, *inter alia*, any disciplinary history or affirmative-action files.  Parks 56.1 ¶¶ 4–5.  However, as a matter of policy, personal-history files are not accessible to panels interviewing candidates for open positions at Parks.  *Id.* ¶ 5.  Parks does not collect race or ethnicity data about employees, although some personnel have access to "Ethic Name" data maintained by the New York State Department of Civil Service.  *Id.* ¶ 15.

When a position within Parks becomes vacant, Human Resources creates a vacancy announcement that sets out the position's minimum qualifications.  *Id.* ¶ 6.  Human Resources is

---

[1] This factual account draws primarily from the parties' submissions in support of and in opposition to Parks' motion for summary judgment, including Parks' Rule 56.1 statement, Dkt. 76 ("Parks 56.1"), Champion's corrected response to Parks' 56.1 statement, Dkt. 82-1 ("Champion 56.1"), Parks' reply to Champion's response to Park's 56.1 statement, Dkt. 89 ("Parks Reply 56.1"), Champion's deposition testimony, Dkt. 73-1 ("Champion Tr."), and the Declarations (some with accompanying exhibits) of Clifford Gonzalez, Dkt. 66 ("Gonzalez Decl."), Maurice Hicks, Dkt. 67 ("Hicks Decl."), Joseph F. Lescinski, Dkt. 68 ("Lescinski Decl."), Scott Matson, Dkt. 69 ("Matson Decl."), Ralph Menar, Dkt. 70 ("Menar Decl."), Frances Rodriguez, Dkt. 71 ("Rodriguez Decl."), Sureash Singh, Dkt. 72 ("Singh Decl."), Brian Lee, Dkt. 74 ("Lee Decl."), and Kim Champion, Dkt. 79-2 ("Champion Decl.").

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and are denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

responsible for evaluating candidates before interviews, to determine whether the candidates meet the minimum qualifications. *Id.* Regional park staff select the interview panel and draft interview questions. *Id.* ¶ 7.

Once the panel, following interviews, selects a candidate for appointment, one interviewer prepares a memo that is reviewed by senior personnel at the Regional Office. *Id.* ¶ 9. The Regional Office completes an Applicant Flow Chart which includes whether the selected candidate meets the minimum qualifications; Human Resources then reviews the chart and personal history, including the disciplinary history, of the selected candidate. *Id.* ¶¶ 10–11. Once the applicant has been approved, Human Resources notifies the Regional Office, who notifies the candidate. *Id.* ¶ 13.

Supervisory or managerial personnel hold Grade 12 or higher positions. *Id.* ¶ 16. Two such positions are Recreation Complex Manager 1 ("RCM1") and Recreation Complex Manager 2 ("RCM2"). *Id.* ¶ 17. There are five RCM2 positions and 10 RCM1 positions in the New York City region. *Id.* ¶ 18. Between June 2007 and June 2018, there have been only one RCM2 vacancy and three RCM1 vacancies in the New York City region. *Id.* Between 2010 and 2018, the Riverbank Athletic Department had two RCM1 positions and two vacancies. Vacancies for such positions are rare, and, due to budget constraints, vacancies are not always filled. *Id.*; Gonzalez Decl. ¶ 3.

### 2.   Champion's Career at Parks

Until 2019, there were six New York State parks in the New York City area, two of which have significant recreational and athletic facilities, such as pools, gymnasiums, sports fields, and basketball courts: Riverbank and Roberto Clemente. Parks 56.1 ¶ 2.

Since July 1, 1993, Champion, an African-American woman, has been employed in Riverbank's Athletics Department as a Recreation Activity Specialist, a Grade 10 position. *Id.*

3

¶ 3; Champion Decl. ¶ 2.  In that role, she manages the tennis program at Riverbank.  Parks 56.1 ¶ 76; Champion Decl. ¶ 19.  Champion is one of the original staff members of Riverbank.  During her tenure at Parks, she has never been promoted from her starting position.  Champion Decl. ¶ 3.  Champion has been consistently rated a "satisfactory" employee.  Parks 56.1 ¶ 78; Champion 56.1 ¶ 78.[2]

For at least 10 years, Champion has exclusively worked a morning shift, 6:00 a.m. to 2:30 p.m., Parks 56.1 ¶ 75, during which she has supervised junior staff, *id.* ¶ 82.  The extent of her supervisory experience is disputed.  *Compare* Champion 56.1 ¶ 82 (claiming that Champion supervised junior employees, including Gomez, between 6 a.m. and 9 a.m. each day); *with* Parks Reply 56.1 ¶ 82 (claiming that Champion only supervised employees when a Grade 14 or Grade 18 employee was not present).  Champion has been supervised by three RCM1s in her time at Riverbank Athletics: Cheryl Strawitch, Moises Rodriguez, and Travis Berry.  Parks 56.1 ¶ 82.  Clifford Gonzalez has held the RCM2 position as head of Riverbank Athletics since 1999.  Champion 56.1 ¶ 62.2.  Champion ultimately reports to Gonzalez through the chain of command.  Parks 56.1 ¶¶ 19, 26; Champion 56.1 ¶ 126.

During her tenure at Parks, Champion has applied for three supervisory positions between 2010 and 2017: (1) the December 2014 RCM1 position in Riverbank Athletics; (2) the December 2016 RCM2 position at Roberto Clemente; and (3) the March 2017 RCM1 position at Riverbank Athletics.

---

[2] Employees are rated either "satisfactory" or "unsatisfactory."  Parks 56.1 ¶ 78; Champion 56.1 ¶ 78; Dkt. 79-9, Ex. 61 (Champion performance review forms).

### 3. The December 2014 RCM1 Position at Riverbank Athletics

In late 2014, Champion applied for a vacant RCM1 position in the Riverbank Athletic Department.  Parks 56.1 ¶ 25.[3]  Senior Riverbank personnel interviewed six candidates, including Champion.  *Id.* ¶ 26.  Gonzalez, Scott Matson (Deputy Regional Director for the New York City region), Maurice Hicks (the Riverbank Park Director), and Ralph Menar (the Operations Manager at Riverbank State Park) participated in the panel.  *Id.*; Menar Decl. ¶ 1.  Matson identifies as white; Menar and Gonzalez are identified in state records as Hispanic.  *See* Parks 56.1 ¶¶ 26, 59.  The panel, comprising only men, nominated Travis Berry, an African-American man, for the position.  *Id.* ¶¶ 26–27.  Around December 18, 2014, with Human Resources having approved his nomination, Berry was appointed to the RCM1 position and became Champion's direct supervisor.  *Id.* ¶ 29.  Parks contends, without refutation, that until this vacancy, this was the first vacancy in the Riverbank Athletic Department in which Gonzalez had a role in selecting the nominee.  *See id.* ¶ 18.

Champion testified that during her interview for this post, she complained that women had not been promoted in the Athletics department in 15 years.  Champion 56.1 ¶ 95; Champion Tr. at 81.

### 4. The December 2016 RCM2 Position at Roberto Clemente Athletics

On November 10, 2016, Parks posted a vacancy announcement for an RCM2 position at Roberto Clemente in the Athletics Department.  Parks 56.1 ¶ 30.  The announcement stated that the minimum qualifications were "[s]even years experience, including two years of supervisory experience, directing an athletic, sports or recreation facility or program[,]" and that certain

---

[3] As Champion appears to concede, any claim for race or gender discrimination based on the December 2014 RCM1 position are time-barred.  *See* Dkt. 25 ("Am. Compl.) ¶ 47.  The Court recounts Champion's 2014 application as background to her claims relating to later applications.

education could be substituted for experience.  Lee Decl., Ex. 5a at 5–6[4] ("2016 RCM2 Vacancy Announcement").  The RCM2 "supervises programs and operations within Roberto Clemente" and "serves at times as shift manager of the entire park . . . ."  *Id.*  In November 2016, Champion applied for the position.  Parks 56.1 ¶ 31.

On December 6 and 7, 2016, Frances Rodriguez, Park Director at Roberto Clemente, and Matson interviewed eight candidates, including Champion.  *Id.* ¶¶ 22, 34.  Rodriguez is listed in state records as a Hispanic woman.  *Id.* ¶ 34.  The outgoing RCM2, John Doherty, was unable to join the interview panel.  *Id.*  The interview questions for the position included questions about whether the candidate had supervised security personnel or had aquatics experience.  *See* Lee Decl., Ex. 5a at 7–9 ("2016 RCM2 Interview Questions").  The parties dispute whether these questions were asked of all persons interviewed for the vacancy.  Champion Decl. ¶ 63; Champion 56.1 ¶ 51.3; Parks Reply 56.1 ¶ 51.3.

The panel nominated Joseph Reid, a Park Recreation Supervisor, for the position, and Rodriguez prepared a nomination memo to that effect.  Parks 56.1 ¶ 37; Champion 56.1 ¶ 37.  The parties dispute the extent to which his experience as a police officer, and thus with security work, and experience in aquatics were relevant to or influenced his selection.  *See* Parks 56.1 ¶¶ 37, 39; Champion 56.1 ¶¶ 37, 39.  In her nomination memo, Rodriguez wrote that Reid's "duties include oversight of the Aquatics complex" and that he has prior experience as a police officer.  Rodriguez Decl., Ex. 2 ("Reid Nomination") at 1.[5]

Human Resources ultimately determined, however, that Reid did not meet the minimum qualifications for the RCM2 position.  Parks 56.1 ¶ 40.  Of the eight candidates, only Champion

---

[4] Page numbers for exhibits to the Lee Declaration refer to docket pages.

[5] Page numbers for exhibits to the Rodriguez Declaration refer to docket pages.

and Ramon Perez met the minimum qualifications. *Id.* ¶ 41. Perez had begun working for Parks in 1999 as a long-term seasonal employee. *Id.* ¶ 50. In 2007, he had been converted to Assistant Park Recreation Supervisor, a Grade 12 position. *Id.* Champion and Perez completed the Part 2 application for the position. *Id.* ¶ 44.

Rodriguez spoke with Riverside Park Director Hicks about both Champion and Perez. Parks 56.1 ¶ 45.[6] Hicks admitted not knowing Perez well but described Champion as bright and responsible. Champion 56.1 ¶¶ 45.1–45.2. Rodriguez also spoke with Sureash Singh, who had supervised both Champion and Perez at Riverbank, and who served as a reference for Perez. Singh Decl. ¶ 9. Singh had supervised Champion in a more "limited capacity," only when her shift overlapped with his. *Id.* ¶¶ 5, 11. Singh recalls "rating [Champion and Perez] fairly close to one another" on the call with Rodriguez. *Id.* ¶ 12. Rodriguez also spoke with Doherty, the outgoing RCM2. Parks 56.1 ¶ 47.

The panel ultimately nominated Perez for the position. Rodriguez prepared a nomination memo to that effect. *Id.* ¶ 48. There, Rodriguez wrote that Perez's "additional skills from his past position as a Park Ranger will work well because the Park Stewards fall under the supervision of the [RCM2]" and that Perez had "a base understanding of the Aquatics department from an internship he completed with the Aquatics Complex Manager." Rodriguez Decl., Ex. 6 ("Perez Nomination") at 2. The parties dispute Perez's experience in supervising security personnel and in aquatics and the extent to which that experience properly bore on his selection as the nominee. *See* Parks 56.1 ¶ 48; Champion 56.1 ¶ 48; Parks Reply 56.1 ¶ 48. The parties further dispute whether Perez met the minimum requirement of two years supervisory

---

[6] Hicks attested that he had unintentionally misled Champion into thinking she had been nominated by having her complete the Part 2 application. *See* Hicks Decl. ¶¶ 4–5.

experience, but Champion cites no evidence to support her suggestion that Perez may not have met the minimum qualifications.  *See* Champion 56.1 ¶ 53.1; Parks Reply 56.1 ¶ 53.1.

On December 21, 2016, Parks approved Perez's appointment.  Parks 56.1 ¶ 54; *see also* Dkt. 75 ("Parks Mem.") at 8.  Following Perez's appointment, on December 22, 2016, Matson emailed Champion to let her know that she had not been selected.  Parks 56.1 ¶ 55.  In that email, Matson stated that the decision had been made based on the "operational needs of the facility," including experience in aquatics and in supervising security personnel.  Matson Decl., Ex. 6 (December 22, 2016 email from Matson to Champion).  Matson also telephoned Champion, *see* Parks 56.1 ¶ 55, but the parties dispute what was said in that conversation.  *Compare* Champion Tr. at 130 (testifying that Matson stated Champion was "overqualified"), *with* Matson Decl. ¶¶ 15–16 (stating that Matson encouraged Champion to apply for future positions).  Champion testified that on this call, she complained to Matson of discrimination during the hiring process.  Parks 56.1 ¶ 98; Champion 56.1 ¶ 98; Champion Tr. at 129–30.  She had not mentioned discrimination during the RCM2 interview.  Parks 56.1 ¶ 97; Champion Tr. at 124.

On December 24, 2016, Champion emailed Gonzalez to request access to her file history to "verify" that "nothing negative is being placed into [her] files/records or intentionally misconstrued to prevent [her] growth as a female employee while applying for upgrades in the park system, especially due to past and even more recent opportunities denied [her] unfairly which all draw serious concerns."  Dkt. 73-10 (December 24, 2016 email from Champion to Gonzalez); Parks 56.1 ¶ 99.

### 5.    The February 2017 RCM1 Position at Riverbank Athletics

On February 1, 2017, Parks posted a vacancy announcement for an RCM1 position for the Riverbank Athletic Department.  Parks 56.1 ¶ 56.  On February 17, 2017, Champion applied for that position.  *Id.* ¶ 57.  In March 2017, Gonzalez, Operations Manager Menar, and Joseph

8

Lescinski, who identifies as white, interviewed nine candidates. *Id.* ¶ 59. Lescinski was at all relevant times a Human Resources Specialist in the New York City Regional Office. Lescinski Decl. ¶ 1. He had participated in a disciplinary investigation of Champion. Champion 56.1 ¶ 60.1; Parks Reply 56.1 ¶ 60.1. Matson asked Lescinski to participate on the interview panel despite being aware that Lescinski had investigated Champion. Champion 56.1 ¶ 60.2. Lescinski disclosed information about Champion's disciplinary history to the panel. *Id.* ¶¶ 60–61; Parks Reply 56.1 ¶¶ 60–61. In 2010, Parks found that Champion had violated Parks' policy regarding use of Parks' property by holding tennis events and retaining entrance fees for personal use. Parks 56.1 ¶ 83. Parks and Champion reached a settlement in the matter in April 2011, under which Champion received a six-week suspension and a termination penalty held in abeyance for five years. Lee Decl., Ex. 10 (settlement agreement between Champion and Parks); Parks 56.1 ¶ 84.

Champion testified that during her interview, she stated that she wanted "upward mobility" for women and stated that "women are not being promoted to supervisory positions at Riverbank State Park and that needs to change." Parks 56.1 ¶ 101; Champion 56.1 ¶ 101. The parties dispute the precise nature of Champion's remarks but agree that Champion made some remarks about women in leadership at Parks. Lescinski's notes from the interview include the following: "Happy more positions being filled w/upward mobility for women[.]" Dkt. 79-10, Ex. 46 (Lescinski's notes taken during Champion's interview for the 2017 RCM1 position).

The panel assigned each candidate a letter grade. Parks 56.1 ¶ 62. As between Champion and the candidate ultimately selected, Richard Gomez, Menar scored both Champion and Gomez as "A"; Lescinski scored Champion as "A/A-" and Gomez as "A," Champion 56.1 ¶¶ 62.5–62.7; and Gonzalez did not score on his sheet. *Id.* The parties dispute whether the

grades were formulated individually.  *See id.*; Parks 56.1 ¶ 62.  *But see* Champion 56.1 ¶ 232

("Lescinski and Menar graded each candidate individually to assist with their respective ranking

and evaluation.").

The panel ultimately nominated Gomez.  Parks 56.1 ¶ 64.  Gomez had been hired by

Parks in 2007 as a seasonal Assistant Park supervisor.  Champion 56.1 ¶ 198.  In or around

January 16, 2014, he had been appointed as a permanent Park Recreation Activity Specialist, a

Grade 10 position.  Parks 56.1 ¶ 69; Champion 56.1 ¶ 199.  He was responsible for managing

Riverbank's baseball team.  Gonzalez Decl. ¶ 11.  The parties dispute whether Parks, in

reviewing Gomez, had had difficulty determining whether he had the required supervisory

experience for the RCM1 position.  Champion 56.1 ¶ 200; Parks Reply 56.1 ¶ 200.

Gonzalez prepared the nomination memo for Gomez.  The memo explained the basis for

Gomez's selection, as well as why Champion and another qualified candidate, Wayne Banner,

had not been chosen.  Parks 56.1 ¶¶ 70–71.  The parties dispute the extent to which the final

memo and earlier drafts reveal that the panel relied on information it should not have considered,

*e.g.*, candidates' excused absences.  *See* Champion 56.1 ¶¶ 70–71.  The final memo stated that

Gomez had been selected because he was "the only candidate that has experience in program

planning and executing planners, registration and the ordering of supplies."  Lee Decl., Ex. 6a

at 4–5 ("Gomez Nomination").  The parties dispute the extent to which Gomez performed this

task independently and correctly.  *Compare* Parks 56.1 ¶¶ 70–71, *with* Champion 56.1 ¶ 70–71,

*and* Champion Decl. ¶¶ 27–36.

The memo further lauded the success of the baseball program under Gomez and stated

that "[n]o other candidate demonstrated the ability to perform managerial tasks which include

youth recruitment and parent involvement and none demonstrated initiative corresponding to

adding travel teams to the baseball league."  Gomez Nomination at 4.  With respect to Champion and Banner, the memo stated, both had interviewed well and were "knowledgeable," but "did not operate their respective programs in the same manner[.]"  *Id.* at 5.  Champion disputes the accuracy of these statements.  Parks 56.1 ¶¶ 70–72; Champion 56.1 ¶¶ 70–72.  On March 22, 2017, Human Resources approved Gomez for the position.  Parks 56.1 ¶¶ 73–74.

> **B.     Procedural History of This Litigation**

On June 16, 2017, Champion completed an Intake Questionnaire at the EEOC New York District Office, in which she alleged discrimination and relation based on the 2014 RCM1 position, the 2016 RCM2 position, and the 2017 RCM1 position.  *Id.* ¶ 103.  On October 27, 2017, Champion filed an official Charge of Discrimination on the basis of race, sex, age, and retaliation.  *Id.* ¶ 104.  On March 6, 2018, the EEOC issued a Dismissal and Notice of Rights. *Id.*

On June 4, 2018, Champion filed her initial Complaint in this case.  Dkt. 1 ("Compl.").  On November 30, 2018, after an initial delay caused by Parks' near-default,[7] the Court held an initial pretrial conference; on December 4, 2018, the Court approved the parties' proposed case management plan.  Dkt. 24.  On December 13, 2018, Champion filed the Amended Complaint, operative here, Am. Compl., which Parks answered on December 27, 2018.  Dkt. 27.

---

[7] Despite having been served with the summons and complaint on June 20, 2018, Parks failed to answer as required by July 11, 2018.  Dkt. 5.  On August 29, 2018, Champion sought, and received, a Clerk's Certificate of Default.  Dkts. 7–10.  On September 26, 2018, Champion moved for a default judgment against Parks.  Dkts. 11–12.  On September 27, 2018, the Court, finding the motion in good order, scheduled a hearing on the motion for default judgment for November 30, 2018.  Dkt. 13.  On November 16, 2018, Parks moved to vacate the default. Dkts. 15–17.  On November 27, 2018, Champion withdrew her motion for a default judgment, Dkt. 18, and the Court vacated the certificate of default, Dkt. 19.

On June 18, 2019, following the close of discovery, Parks filed a letter motion stating that it intended to move for summary judgment, Dkt. 54, and, on July 16, 2019, a pre-motion conference was held, Dkt. 56.

On September 13, 2019, Parks filed its motion for summary judgment and supporting affidavits and exhibits.  Dkts. 64–76.  On October 22, 2019, Champion filed her opposition to Park's motion.  Dkt. 79.  On October 23, 2019, Champion wrote to inform the Court of inadvertent errors in her citations to Parks' 56.1 Statement and to request leave to file a corrected brief and responsive 56.1 statement, Dkt. 80, which the Court granted, Dkt. 81.  On October 25, 2019, Champion filed her corrected opposition and response.  Dkt. 82 ("Champion Opp.").  On October 25, 2019, Parks moved for permission to respond to Champion's response to Parks' 56.1 statement on the ground that Champion's response 56.1 statement appended additional "undisputed" facts to the end of Park's 56.1 statement, added "undisputed" facts to its objections to Park's 56.1 statement, and included non-responsive or irrelevant responses.  Dkt. 83. Champion opposed the motion.  Dkt. 84.  On October 30, 2019, the Court granted Parks' motion. Dkt. 85.  On November 15, 2019, Parks filed its reply and supporting memorandum, including its reply to Champion's response to Park 56.1 statement.  Dkts. 88–89.

## II.    Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

In cases that involve claims of discrimination or retaliation, courts must use "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted). However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). Thus, even in the context of a discrimination case, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb*, 521 F.3d at 137; *see*

13

*also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010), and courts may grant summary judgment against "discrimination claims in cases lacking genuine issues of material fact," *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (citation omitted).

## III.    Discussion

Champion brings claims of sex and race discrimination and retaliation under Title VII in connection with Parks' decision not to promote her to either the 2016 RCM2 or the 2017 RCM1 position.[8]  The Court first examines Champion's discrimination and then her retaliation claims.

### A.    Discrimination Claims

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Title VII discrimination claims are analyzed under the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  *Holcomb*, 521 F.3d at 138. To do so, the plaintiff must show that (1) she "belonged to a protected class"; (2) she "was qualified for the position [s]he held"; (3) she "suffered an adverse employment action"; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (quoting *Holcomb*, 521 F.3d at 138).  The burden of establishing a *prima facie* case in an employment discrimination case is "minimal." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019).

---

[8] Champion's original complaint also brought age discrimination claims and sex and race discrimination claims based on the 2014 RCM1 position.  Compl.  The Amended Complaint drops these claims, apparently in recognition that they are time-barred.

If the plaintiff can demonstrate a *prima facie* case, "a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54 (1981)). The burden of production then shifts to the employer to "'articulate some legitimate, nondiscriminatory reason' for the disparate treatment." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (employer's burden is "one of production, not persuasion").

If the employer satisfies that burden, the presumption of discriminatory intent "drops out of the analysis[,]" and "the plaintiff must establish, by a preponderance of the evidence, that the employer's justification is a pretext for discrimination." *Reeves*, 530 U.S. at 142); *see also Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996). The plaintiff, however, is "not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that a prohibited factor was at least one of the 'motivating' factors" for the decision. *Holcomb*, 521 F.3d at 138 (citation omitted); *see also* 42 U.S.C. § 2000e-2(m) (race, color, or sex must be "a motivating factor" for employment decision). However, "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). A plaintiff cannot defeat a summary judgment motion by "offering purely conclusory allegations of discrimination, absent any concrete particulars[.]" *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

### 1.    *Prima Facie* Case

Parks does not dispute that Champion can establish the first three elements of a *prima facie* case for gender and race discrimination. Parks does not contest that, as an African-

American woman, Champion 56.1 ¶ 105, Champion is a member of a protected class.  Nor does

Parks dispute that Champion was qualified for her job and for each promotion she sought.

Champion received satisfactory ratings in her current position, Parks 56.1 ¶ 78; Champion 56.1

¶ 78, and met the minimum qualifications for both the 2016 RCM2 and the 2017 RCM1 posts,

*see* Parks 56.1 ¶¶ 41, 58.  Finally, Parks does not dispute that, when Parks declined to promote

Champion to either the 2016 RCM2 position or the 2017 RCM1 position, Champion experienced

an adverse employment event.  *See Terry*, 336 F.3d at 139 (citing *Phillips v. Bowen*,

278 F.3d 103, 109 (2d Cir. 2002) (decision not to promote constitutes adverse employment

event)).  Parks instead argues that Champion has failed to adduce evidence sufficient to satisfy

the fourth prong, namely, "any evidence that Parks' hiring decisions gave rise to an inference of

discrimination based on her race (African-American) or sex (female)."  Parks Mem. at 15.

The facts required to demonstrate an inference of discrimination "inevitably vary in

different employment discrimination cases."  *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53

(2d Cir. 2001); *see Little v. Nat'l Broad. Co.*, 210 F. Supp. 2d 330, 377 (S.D.N.Y. 2002).  The

circumstances giving rise to such an inference may include "the employer's criticism of the

plaintiff's performance in ethnically degrading terms; or its invidious comments about others in

the employee's protected group; or the more favorable treatment of employees not in the

protected group; or the sequence of events leading to the [adverse action]."  *Littlejohn v. City of

New York*, 795 F.3d 297, 312 (2d Cir. 2015) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502

(2d Cir. 2009)).  Where there is no direct evidence of discrimination, a plaintiff may rely on

indirect or circumstantial evidence.  *See Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991).

Here, the Court has some doubt that Champion has met her *prima facie* burden with

respect to her claims of gender discrimination.  Champion has not come forward with any

evidence that any person involved in the appointment, in lieu of her, of either Perez or Gomez made any remarks—disparaging or otherwise—about Champion's sex or race. *See* Parks 56.1 ¶¶ 88–90; Champion Tr. at 151, 175, 250; *see also* Champion Opp. at 5. Champion's claim that Parks' decision to promote others gives rise to an inference of discrimination survives, therefore, only if she can muster sufficient indirect and circumstantial evidence to that effect.

In support of her *prima facie* case, Champion cites only the fact that she is a woman who met the minimum qualifications but was passed over for "comparators [who] were male." Champion Opp. at 5. However, in her arguments regarding the third step of the *McDonnell-Douglas* framework, Champion adds that Parks' decision not to promote her occurred against a larger backdrop: its failure to promote women in the Athletics department. In particular, she notes that no women have been promoted since Gonzalez, in 1999, was hired as RCM2 of Riverbank Athletics. *See* Champion 56.1 ¶ 128. But that statistic, in context, does not support an inference of gender discrimination here, for two reasons. First, a woman, Cheryl Strawitch served as RCM1 of Riverbank Athletics between 1995 and 2011 before requesting a transfer. Lee Decl. ¶ 29; *id.*, Ex. 8 at 27–30 (Human Resources employment history data for Cheryl Strawitch). Second, and more important, between 1999 and 2017 there were only two RCM1 vacancies in Riverbank Athletics: the positions for which Champion applied in 2014 and 2017. Lee Decl. ¶ 29; *id.*, Ex. 7 (RCM1 appointment report dated January 31, 2019); Parks 56.1 ¶ 18. In light of the sparse number of vacancies (two), the fact that the person promoted to each was male is insufficient, without more, to give rise to a generalized inference of gender discrimination in promotions on which Champion may draw in challenge the decisions adverse to her. Alone, numerical and statistical arguments are unlikely to be enough to support an inference of discrimination in individual actions involving a failure to promote. *Cf Hudson v.*

*Int'l Bus. Machs. Corp.*, 620 F.2d 351, 355 (2d Cir. 1980).  Where numerical and statistical

arguments, in connection with other evidence, do support an inference of discrimination at the

*prima facie* stage, such cases almost always involve a larger sample size than is available here.

*See, e.g.*, *Vuona v. Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 371 (S.D.N.Y. 2013) (plaintiff

made *prima facie* case of gender discrimination, by a "small margin," by demonstrating that

seven out of eight female trainees were terminated compared to only seven out of 20 male

trainees).

Champion separately argues that Parks' promotion of "less qualified male candidates"

supports an inference of gender discrimination.  Champion Opp. at 2.  A Court may consider the

relative qualifications of the candidates at the *prima facie* stage in failure to promote cases.  *See,*

*e.g.*, *Anyanwu v. City of New York*, No. 10 Civ. 8498 (AJN) (THK), 2013 WL 5193990, at *15

(S.D.N.Y. Sept. 16, 2013) (in failure-to-promote cases, courts may examine relative

qualifications in determining whether plaintiff has met *prima facie* burden).  Champion does not

dispute that both Perez and Gomez met the minimum qualifications for the positions to which

they were promoted.  Parks 56.1 ¶ 41; Champion 56.1 ¶ 41;[9] Champion Opp. at 6.  Instead, she

notes her greater years of experience and ostensibly superior administrative and supervisory

skills.  *See* Champion Opp. 8–21.  She argues that her qualifications were so superior to those of

Perez and Gomez as to permit an inference of discriminatory intent.  *See, e.g.*, Champion 56.1

¶¶ 30–55, 188–197; Champion Decl. ¶¶ 5, 21, 60–69.  However, for this proposition, Champion

largely relies on conclusory characterizations of her skills.  To the extent these statements are

supported by admissible evidence, they mostly address Champion's managerial and

---

[9] Champion's response to Parks 56.1 ¶ 41 disputes the extent to which other candidates were a
"second choice" to Reid, but she does not dispute that she and Perez were the only candidates
who met the minimum qualifications.  *See* Champion 56.1 ¶ 41.

administrative qualifications, which she casts as superior to Perez's and Gomez's.  Champion,

for example, points to the (disputed) fact that Perez failed to submit a cover letter with his

application, which Champion contends demonstrates that he was not qualified.  Champion 56.1

¶ 138.

      However, Parks has never claimed that Champion was not qualified for the position or

even that she was not competitive.  In fact, Parks concedes that Champion may have superior

administrative skills, *see* Dkt. 88 ("Parks Reply") at 7, and it is undisputed that Champion has

been at Parks longer than Perez or Gomez.  But years of service in Parks was, undisputedly, not

identified as a germane consideration for either the RCM1 or RCM2 position.  *See* Parks 56.1

¶ 17.  Further, Parks was free to value certain qualifications, such as experience with security and

aquatics, over others.  And Champion does not offer admissible evidence—beyond her

subjective say-so—that as to the full universe of relevant qualifications, hers exceeded those of

Perez or Gomez.  *See Pearson v. Lynch*, No. 10 Civ. 5119 (RJS), 2012 WL 983546, at *6

(S.D.N.Y. Mar. 22, 2012) ("Without more, however, [plaintiff's] disagreement with his

managers' assessment of his performance simply does not evidence discriminatory intent.");

*Crews v. Trustees of Columbia Univ. in City of N.Y.*, 452 F. Supp. 2d 504, 526 (S.D.N.Y. 2006)

("Although [a plaintiff] may disagree with [an employer's] determination that [another

candidate] was more qualified than [s]he, courts are not permitted to second-guess the

reasonableness of the employer's criteria for employment or the merits of its selection for the

position.").

      In the end, however, the Court will assume *arguendo* that Champion's claim of gender

discrimination clears the *prima facie* hurdle.  As Champion notes, the Second Circuit has held

that when an employee in a protected class is terminated and replaced with someone outside the

19

protected class, that alone is enough to support the inference of discrimination required to make

out a *prima facie* case. *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).

To be sure, courts in this district have divided as to whether *Zimmerman* applies in failure-to-

promote cases. *Compare Feliciano v. City of New York*, No. 14 Civ. 6751 (PAE),

2015 WL 4393163, at *4 (S.D.N.Y. July 15, 2015) (applying *Zimmerman* in failure-to-promote

case), *and Toomer v. Dep't of Educ. of City of N.Y.*, No. 09 Civ. 9034 (RLE), 2013 WL 1286161,

at *6 (S.D.N.Y. Mar. 28, 2013) (same), *with Anyanwu*, 2013 WL 5193990, at *15 (S.D.N.Y.

Sept. 16, 2013) (distinguishing *Zimmerman* from failure-to-promote cases). And here, it is

undisputed that Perez and Gomez, who are both men, were promoted over Champion. Given this

unresolved question in the case law and the minimal nature of the required *prima facie* showing,

*see, e.g.*, *St. Mary's*, 509 U.S. at 506; *Lenzi*, 944 F.3d at 107; *Byrnie v. Town of Cromwell, Bd. of

Educ.*, 243 F.3d 93, 101 (2d Cir. 2001); *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467

(2d Cir. 2001), it is prudent to assume without deciding that Champion has met her *prima facie*

burden with respect to her sex-discrimination claims.

The same, however, cannot be said regarding Champion's race discrimination claims.

Champion does not even address these discrimination claims in arguing that the evidence can

establish a *prima facie* case. Champion Opp. at 5. Nor does Champion defend these claims in

addressing the third leg of the *McDonnell Douglas* test, *i.e.*, whether there is a basis to view the

non-discriminatory reasons given for the hiring of Perez and Gomez, respectively, over

Champion, as pretextual. *See id.* at 6–21. All indications are that Champion, at the summary

judgment stage, has abandoned her race-discrimination claims, as Parks notes. *See* Parks Reply

at 2; *see also Jackson v. Fed. Express*, 766 F.3d 189, 195, 197–98 (2d Cir. 2014) (where a party

is counseled, "a partial response arguing that summary judgment should be denied as to some

claims while not mentioning others may be deemed an abandonment of the unmentioned claims.").  On that ground, summary judgment is thus properly granted to Parks on Champion's race-discrimination claims.[10]

### 2.    Legitimate, Nondiscriminatory Reasons

Treating Champion as having met her minimal burden of presenting a *prima facie* case of employment discrimination on the basis of sex, the Court considers next whether Parks has come forward with a legitimate non-discriminatory reason why a male candidate—Perez, in connection with  the 2016 RCM2 position, and Gomez, in connection with the 2017 RCM1 position—was chosen over Champion for the promotions she sought.  An "employer's explanation of its reasons must be clear and specific in order to afford the employee a full and fair opportunity to demonstrate pretext."  *Byrnie*, 243 F.3d at 105 (quoting *Meiri*, 759 F.2d at 996–97) (internal quotation marks omitted).  Here, based on the evidence adduced, Parks has identified non-discriminatory justifications for each decision.

#### a.    The December 2016 RCM2 Position at Roberto Clemente Athletics

Drawing on contemporaneous documentation during the interview and selection process, Parks identifies two non-discriminatory reasons for selecting Perez for the RCM2 position.  Each involved experience that Perez had relevant to the operational needs of Roberto Clemente.  First, Parks represents that Perez was selected due to his experience supervising security personnel. *See* Perez Nomination.  Roberto Clemente has had problems with gang activity, a fact of which Champion was aware when she applied for the post.  Champion 56.1 ¶ 171.  Consequently, the interviewers placed a premium on experience supervising security personnel, such as the park

---

[10] Even if Champion had not abandoned these claims and was assumed to have established a *prima facie* case of racial discrimination, for the reasons addressed *infra* in connection with the gender discrimination claims, she has not adduced any evidence that Parks' stated non-discriminatory bases for promoting others were pretextual.

stewards who serve as security at Roberto Clemente.  *See* Perez Nomination at 3 (noting Perez's experience as a Park Ranger would "work well because the Park Stewards fall under the supervision of the [RCM2]"); 2016 RCM2 Interview Questions (questions included a question on experience "supervis[ing] security personnel"); Matson Decl., Ex. 6 (December 22, 2016 email from Matson to Champion explaining that the panel chose the candidate who could best meet the "operational needs" of the park, including "supervision of the park stewards on a year round basis").  Second, Parks notes, Perez was selected due to his experience with aquatics. Roberto Clemente has a large aquatics facility, which may require the RCM2 to manage as many as 50 aquatics employees during the summer.  Parks 56.1 ¶ 32.  Thus, the interview questions for the position included a question on experience "supervising and/or maintaining an Aquatics facility" and about any pool certifications the applicant possessed.  2016 RCM2 Interview Questions.

It was because the interview panel emphasized these two factors that the panel initially nominated Joseph Reid for the RCM2 position.  In her nomination memo for Reid, Park Director Rodriguez emphasized that Reid had worked as a police officer and that his current duties at Parks "include[d] oversight of the Aquatics complex [at Roberto Clemente] . . . ."  Reid Nomination at 3.  Ultimately, however, as noted, Reid did not meet the minimum qualifications because he did not possess the required experience directing recreation activities.  Parks 56.1 ¶ 40.

As between Perez and Champion, Parks points to contemporaneous evidence explaining the panel's decision to nominate Perez based on his experience in supervising security personnel and with aquatics.  Parks Mem. at 18.  In her nomination memo, Rodriguez emphasized that Perez had "additional skills from his past position as a Park Ranger" that would assist in

supervising the park stewards, and noted that Perez had experience in aquatics from an internship he had completed with the aquatics complex manager.  Perez Nomination at 3.

Parks' determination that Perez possessed "superior qualifications" in these areas relevant to the supervisory post in question, despite his shorter tenure at Parks than Champion, supplies a legitimate, non-discriminatory reason for selecting him over Champion.  A candidate's superior qualifications for the position at issue is the paradigmatic legitimate, non-discriminatory reason for hiring that candidate.  *See Ibrahim v. N.Y. State Dep't of Health, Off. of Health Sys. Mgmt.*, 904 F.2d 161, 167 (2d Cir. 1990); *see also, e.g.*, *Lloyd v. WABC-TV*, 879 F. Supp. 394, 402 (S.D.N.Y. 1995) (employer's determination that other candidate had superior qualifications, notwithstanding plaintiff's experience, upheld as a legitimate, nondiscriminatory reason for not selecting plaintiff).

### b.    The February 2017 RCM1 Position at Riverbank Athletics

Again drawing on the contemporaneous memo prepared by the panel nominating Gomez for the RCM1 position, Parks identifies as bases for his selection that he had managed and grown the "most successful" program within Riverbank's Athletic department, its youth baseball program, and had programmatic experience that Champion lacked.  Parks Mem. at 19.  Before the interviews, Parks notes, the panel had viewed Champion "among the top candidates."  *Id.* at 8.  But, according to the nomination memo, the panel selected Gomez because he was "the only candidate that has experience in program planning and executing planners, registration and the ordering of supplies."  Gomez Nomination at 4.  The memo added that "[n]o other candidate demonstrated the ability to perform managerial tasks which include youth recruitment and parent involvement, and none demonstrated initiative corresponding to adding travel teams to the baseball league."  *Id.*  The memo added that although Champion and a third candidate, Banner, were knowledgeable and had done satisfactory work, neither would be as "dependable" in

"growing and developing programs." *Id.* at 5. These relevant aspects of Gomez's experience are legitimate, non-discriminatory reason for his selecting Gomez over Champion. *See Ibrahim*, 904 F.2d at 167. In addition, Parks cites evidence that Gomez "pleasantly surprised" the panel with his interview. Parks Mem. at 19. The interviewers scored Gomez slightly higher than Champion in aggregate, with Operations Manager Menar scor[ing] both Champion and Gomez as "A," and Human Resources Specialist Lescinski scoring Champion as "A/A-" and Gomez as "A." Champion 56.1 ¶¶ 62.5–62.7. Gonzalez did not score on his sheet. *Id.* Further, Gonzalez, Lescinski, and Menar each state that Gomez performed very well in the interview. Gonzalez Decl. ¶ 11; Lescinski Decl. ¶ 8; Menar Decl. ¶ 7. Superior performance in an interview is also a legitimate, non-discriminatory reason for selecting a candidate. *See Byrnie*, 243 F.3d at 104 ("[T]here is nothing unlawful about an employer's basing its hiring decision on subjective criteria, such as the impression an individual makes during an interview." (quoting district court)).

Parks has therefore articulated legitimate, non-discriminatory reasons for promoting a male candidate over Champion as to each position.

### 3. Pretext

Because Parks has articulated legitimate, non-discriminatory reasons for its decision to promote others for the two open positions, Champion, to survive summary judgment, must present "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Forte v. Liquidnet Holdings, Inc.*, 675 F. App'x 21, 25–26 (2d Cir. 2017) (summary order) (alternations omitted) (quoting *Weinstock*, 224 F.3d at 42); *see also Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (at third *McDonnell Douglas* step, admissible evidence must show that defendants' decision was "more likely than not based in whole or in part on discrimination" (citation omitted)).

24

Here, Champion has not come forward with any evidence—testimonial or documentary—impeaching as pretextual Parks' stated reasons for appointing others to the positions she sought.  And, as noted, those reasons were memorialized in the contemporaneous memos nominating, respectively, Perez and Gomez.  Champion's argument for pretext is instead that her credentials were superior to theirs.  This argument presents a high degree of difficulty: where a plaintiff contends that her superior credentials constitute evidence sufficient to show by a preponderance that the defendant's legitimate, non-discriminatory reasons for an adverse hiring decision are merely pretext, the plaintiff's "credentials would have to be so superior to the credentials of the person selected for the job that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'"  *Byrnie*, 243 F.3d at 103 (quoting *Deines v. Tex. Dep't of Protective & Regul. Servs.*, 164 F.3d 277, 28081 (5th Cir. 1999)).

Viewing all disputed facts in the light most favorable to Champion, the evidence does not meet this standard.

> a.    *The December 2016 RCM2 Position at Roberto Clemente Athletics*

As to the RCM2 position at Roberto Clemente, Champion argues that Reid's initial nomination is evidence of pretext because Reid was "substantially less qualified" than she was for the position.  Champion Opp. at 8.  But Champion's arguments to this effect fall short.  She emphasizes that Reid was hired by Parks in 2015 and was nominated for the promotion the following year.  *Id.*  But it is undisputed that the length of a candidate's service within Parks was not a consideration for the RCM2 position.  *See* Parks 56.1 ¶ 17.  Reid's shorter tenure thus does not support Champion's thesis that he was a clearly inferior candidate.  And while Champion asserts that Matson testified that "Reid was substantially less qualified than the Plaintiff at the time of the decision[,]" Champion Opp. at 8, Champion does not cite any testimony supporting

this claim.  *See* Parks 56.1 ¶ 48; Champion 56.1 ¶ 48.  Champion appears to be referring to a November 29, 2016 memo from Human Resources Specialist Lescinski to Matson that questioned whether Reid had the seven years of experience directing and managing recreation programs required for the RCM2 position.  *See* Lescinski Decl., Ex. 1; *see also* Parks 56.1 ¶ 33. But Champion does not offer evidence that the decision to proceed with Reid as the nominee despite this ultimately fatal impediment was motivated by discriminatory intent.  Notably, Perez, a male candidate who met the minimum qualifications, would have been equally prejudiced by Reid's selection.

Champion next argues that Parks' proffered reasons are pretextual because the vacancy announcement for the position did not specifically mention experience with security personnel or aquatics.  Champion Opp. at 12–13.  Champion argues that the panel's citation of these reasons was a pretext to justify nominating men—first Reid and then Perez.  *See id.* at 13.  But although the vacancy announcement does not specifically mention either of these activities, it did note that the RCM2 "supervises programs and operations within Roberto Clemente" and "serves at times as shift manager of the entire park."  2016 RCM2 Vacancy Announcement.  Those descriptions are easily broad enough to encompass the areas on which the panel focused.  And Champion admits that Roberto Clemente had had issues with gang activity (the panel's stated basis for giving weight to the candidates' experience with security) and a large aquatics facility. Champion 56.1 ¶ 171; Parks 56.1 ¶ 32.[11]  Notably, too, the panel's focus on these issues was memorialized in real time.  Its memo initially nominating Reid specifically mentioned his experience both as a police officer and in aquatics.  Reid Nomination at 2.

---

[11] Champion disputes whether supervising the aquatics facility was included in the vacancy announcement but does not dispute that Roberto Clemente has a large aquatics facility. Champion 56.1 ¶ 32.2.

In any event, even if the broadly worded vacancy announcement had not been broad enough to embrace the qualities that the panel prioritized, Parks was not required to list in advance each specific credential on which it might ultimately rely in selecting a candidate. *See Jimenez v. City of New York*, 605 F. Supp. 2d 485, 525 (S.D.N.Y. 2009).  Provided that it did not rely on improper factors such as gender, Parks was free to "weigh credentials as it wishe[d]," and "the fact that some decision makers relied on credentials or experience that were not listed on the job posting announcement does not give rise to any inference that they were engaged in impermissible discrimination." *Id.*

Moreover, the interview questions for the RCM2 position included questions to which the qualifications at issue were squarely responsive.  These questions inquired, among other topics, whether the candidate had supervised security personnel and had experience with aquatics. *See* 2016 RCM2 Interview Questions.  Champion concedes that the "interview questions were crafted to flesh out the applicant's ability to meet the vacancy requirements." Champion Opp. at 9.  She claims that, at her interview, she was asked about her minimum qualifications, but not about security or aquatics experience.  Champion Decl. ¶ 63.[12]  Even crediting that factual claim,

---

[12] Champion also states that the interviewers took notes that were "spoliat[ed]."  Champion Opp. at 9, 13, 20.  Because the interviewers' notes were not produced by Parks, Champion argues that the fact finder cannot know the questions put to which candidates or how each responded. *Id.* Champion, however, did not raise with the Court any dispute during discovery as to the non-production of such notes.  And, in connection with summary judgment, she has not come forward with admissible evidence that such notes, assuming they were retained after the interviews, were discarded after this litigation became foreseeable or errantly not produced, or of any other discovery malfeasance.  To the extent that Champion implies by her reference to spoliation that an adverse inference is warranted, she therefore has not established the requisite factual basis. *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (party seeking an adverse inference instruction based on destruction of evidence must show that (1) the party having control over the evidence had an obligation to preserve evidence; (2) the records were destroyed with a culpable state of mind; and (3) the evidence was relevant to a party's claim).

this lapse would not itself be reason to infer that the panel's selection reflected gender bias. Champion does not point to any basis to infer that Parks did not base its decision to nominate Reid and later Perez on their experiences in these areas, as opposed to the impermissible fact of gender. And Champion does not cite admissible evidence that the outcome of the promotion decision would have been different had such queries been put to her. Although Champion alludes to some experience in security and aquatics, Champion 56.1 ¶ 186; Champion Decl. ¶¶ 5, 22, 60, 63; Champion Opp. at 13, she does not claim to have had *equivalent* experience in security or aquatics; she has not worked as a police officer, park ranger, or park steward, nor completed training or an internship in aquatics. Champion 56.1 ¶ 51. Finally, to the extent that Champion downplays these experiences of her comparators, *e.g.*, by terming park rangers and stewards as simply "staff to be managed," Champion Opp. at 13; *see also* Champion Decl. ¶ 61–67, or that Perez's internship does not constitute "formal" aquatics training, Champion 56.1 ¶ 51.7, the panel was within its discretion to take a different view of such experience.

Champion next asserts that her administrative and supervisory skills were vastly superior to Perez's, so as to make his selection inherently suspect. She faults Perez for not submitting a cover letter with his application, making it incomplete. Champion Opp. at 8. "[P]rocedural irregularities" indeed can "raise a question as to the good faith of the [hiring] process where the departure may reasonably affect the decision." *Weinstock*, 224 F.3d at 45. But here, even assuming that Perez did not ultimately cure this defect (as Parks contends he did), Champion does not point to evidence that the omission of a cover letter was a substantial departure from the normal process or one that reasonably would have affected the promotion decision.

On the merits, Parks concedes that Champion's administrative and writing skills may indeed have been stronger than Perez's. *See* Parks Reply at 7. But, as Parks rightly notes, that

does not mean that its decision to give weight to other qualifications, such as his security and aquatics experience, are pretextual.[13]  A "plaintiff's subjective assessment of [her] qualifications is insufficient to create a genuine issue of fact as to whether an employer's proffered reason for selecting the successful candidate was pretext for discrimination." *Anderson v. N.Y.C. Health & Hosps. Corp.*, No. 16 Civ. 1051 (GBD) (KHP), 2020 WL 2866960, at *13 (S.D.N.Y. Mar. 2, 2020), *report and recommendation adopted*, No. 16 Civ. 1051 (GBD) (KHP), 2020 WL 1528101 (S.D.N.Y. Mar. 31, 2020); *see also Petrovits v. N.Y.C. Transit Auth.*, No. 95 Civ. 9872 (DAB), 2002 WL 338369, at *7 (S.D.N.Y. Mar. 4, 2002) ("Plaintiff's subjective belief that she possesses superior qualifications does not by itself support an inference of discrimination.").

Finally, Champion discounts the panel's focus on security work as "stereotype-based innuendo[]."  Champion Opp. at 20.  Champion likens her circumstances to those in *Walsh v. New York City Housing Authority*, 828 F.3d 70 (2d Cir. 2016), in which a woman was not hired as a bricklayer on the ground that the employer wanted someone "stronger."  The Second Circuit found this assumption about the candidates' credentials problematic, noting Walsh's testimony that she had never been asked about her strength.  As the Circuit recognized:  "[T]he fact that strength was not mentioned [during the interview] tends to support the inference that the interviewers succumbed to a sex-based stereotype" because Walsh was not given an opportunity to demonstrate that she had the strength required for the job.  *Id.* at 80.  There is no comparable

---

[13] Also misplaced is Champion's claim that Doherty attested to her clear superiority over Perez for the vacancy.  Champion relies on Doherty's December 9, 2016 email to Park Director Rodriguez describing Perez and Champion.  *See* Dkt. 79-9, Ex. 26 ("Doherty Email").  But Doherty's email largely relays comments that Rodriguez had allegedly made about Perez, not Doherty's views.  And, to the extent Doherty's email describes his interaction with Perez, Doherty later explained that he had confused another individual for Perez, whom he had never actually met.  *See* Dkt. 65 ¶ 10 n.5 (Doherty Declaration).

claim here that the panel's determination that Perez had superior work experience in the area of security derived from an improper gender-based assumption. Rather, his deeper experience in this area is undisputed. Champion's argument is instead that the panel should have given less weight to this factor than it did. But its decision to weigh qualifications differently does not, without more, bespeak gender bias.[14]

b.    *The February 2017 RCM1 Position at Riverbank Athletics*

As to the second promotion, for the RCM1 position at Riverbank, Champion makes a series of arguments in support of her claim of gender discrimination.

Her first argument is that she was "more equipped" for this post than Gomez, because Gomez had held a temporary position from 2007 to 2014 in Parks and first became a permanent Park Recreation Activity specialist in 2014. Champion Opp. at 14. However, as explained, years of service in Parks had not been identified as, and was not, a qualification for either position Champion sought. *See* Parks 56.1 ¶ 17.

Second, Champion argues that she has superior "program planning experience and shift supervisory experience." Champion Opp. at 15. But this argument relies on Champion's subjective assessment that her experience measures up better than Gomez's. *See id.* at 19; *see also* Champion Decl. ¶¶ 26–36. She admits, moreover, that she has not been involved in, and is not familiar with, Parks' baseball program, Gomez's involvement in which was a factor emphasized by the panel in its nomination memo. Champion Tr. at 21. Notably, perhaps

---

[14] Champion also faults panel member Matson for asking her to confirm her willingness to work a night shift, as the Roberto Clemente post required. Champion Opp. at 20; Champion 56.1 ¶ 8.6. But, as Parks notes, Matson's desire to confirm Champion's willingness to change her schedule, which she had held for at least 10 years, implies that he was seriously considering her for the position. Regardless, Champion's interpretation of this query as bespeaking gender bias is tenuous—and too speculative a basis on which to infer that the panel's selection of Perez was motivated by gender discrimination.

reflecting the different strengths and experiences Champion and Gomez would have brought to the position, Lescinski and Menar scored the two as close contenders, assigning them similar letter grades.  Champion 56.1 ¶ 62.5–62.7.  The record does not permit the inference that the panel, in not agreeing with Champion that there was clear daylight between the two, was blindered by gender bias.

Third, Champion argues that the lack of a promotion of a female in the Athletic Complex by Gonzalez since he began at Parks in 1999 indicates discriminatory intent.  Champion Opp. at 16.  Lopsided outcomes along gender lines can support an inference of gender discrimination.  But not so here.  As noted, there have only been two RCM1 openings in Riverbank Athletics since Gonzalez started: the posts for which Champion unsuccessfully applied in 2014 and 2017.  Lee Decl. ¶ 29; *id.*, Ex. 7 (RCM1 appointment report dated January 31, 2019); Parks 56.1 ¶ 18.  As a matter of statistical significance, that male candidates were appointed to each position is too sparse a pattern to give rise to an inference of discriminatory motivation.

Fourth, Champion argues that Gonzalez "distort[ed]" Champion's attendance record at Parks to give the impression that she is unreliable.  Champion Opp. at 18.  Champion contends that after learning that Champion's absences had been justified, Gonzalez edited the RCM1 nomination memo, changing it to state that Champion "is not reliable as it pertains to attendance" to Champion is "unreliable and not dependable," and finally to Champion "is unreliable and not dependable as pertains to consistency in supervising and growing and developing programs."  *Id.*; *see also* Dkt. 79-10, Exs. 39–42 (Gonzalez's drafts of the nomination memo for Gomez).  However, Gonzalez made identical statements and edits to the comments for Banner, a male applicant who also met the minimum qualifications.  *See* Dkt. 79-10, Exs. 39–42 (Gonzalez's

drafts of the nomination memo for Gomez).  Whether or not Gonzalez's assessment as to

Champion was fair, the claim that he disfavored her on account of her gender is speculative.

c.      *Parks Promotion Process*

All qualifications considered, Champion's credentials cannot be said to have been "so

superior" to those of Perez and Gomez that "no reasonable person, in the exercise of impartial

judgment, could have chosen" the candidate competing with Champion.  *Byrnie*, 243 F.3d

at 103.  With there otherwise being no evidence indicative of gender discrimination, Champion

has failed to adduce evidence sufficient to discount Parks' legitimate justifications for promoting

Perez as pretextual.

Significant too—and further undermining Champion's claim—is the process used by

Parks to select candidates for promotion, a process Champion does not challenge.  Champion

Opp. at 6.  It is undisputed that the process involves decision-makers at multiple levels of Parks

and in multiple offices.  Support from the interview panel alone is not enough—as reflected in

Human Resources' refusal to move forward with the appointment of Reid as RCM2 for Roberto

Clemente.  Parks 56.1 ¶ 40.  That the Parks' promotion process is multi-step and multi-level,

with an ultimate decision requiring the buy-in of multiple actors, makes a gender-discrimination

inference here, with no direct evidence of gender bias having been adduced, all the more

tenuous.

The Court accordingly finds that, although Champion was qualified for both positions to

which she applied, she has not adduced sufficient evidence to permit a factfinder to find that

Parks' proffered reasons for promoting competing candidates were a pretext for sex

discrimination.  The Court therefore grants Parks' motion for summary judgment as to her sex-

discrimination claims.

32

B.      **Retaliation Claims**

1.      **Applicable Legal Principles**

Title VII forbids an employer from discriminating against an employee because the

employee "has opposed any practice made an unlawful employment practice by this subchapter,

or because [s]he has made a charge, testified, assisted, or participated in any manner in any

investigation, proceeding, or hearing under this subchapter."   42 U.S.C. § 2000e-3(a).

Like discrimination claims, retaliation claims under Title VII are analyzed using the

*McDonnell Douglas* burden-shifting framework.  *See Zann Kwan v. Andalex Grp. LLC*,

737 F.3d 834, 843 (2d Cir. 2013).  As with Champion's discrimination claim, she must first

make out a *prima facie* case.  To establish a *prima facie* case of retaliation, a plaintiff must

establish: "(1) that she participated in an activity protected by Title VII, (2) that her participation

was known to her employer, (3) that her employer thereafter subjected her to a materially

adverse employment action, and (4) that there was a causal connection between the protected

activity and the adverse employment action."  *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552

(2d Cir. 2010).  The burden of proof at the *prima facie* stage has been characterized as "*de

minimis.*"  *Hicks*, 593 F.3d at 166.  If this initial burden is met, a "presumption of retaliation"

arises, which the employer "may rebut by 'articulating a legitimate, non-retaliatory reason for the

adverse employment action.'"  *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015)

(brackets omitted) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).

Where the employer provides such a reason, "the presumption of retaliation dissipates,"

and the burden shifts back to the plaintiff to prove "that the desire to retaliate was the but-for

cause of the challenged employment action."  *Id.* (citations omitted).  Although "but-for"

causation does not require a showing that retaliation was an employer's sole motive, showing

that retaliation was "simply a 'substantial' or 'motivating' factor in the employer's decision" is

33

insufficient to prove a retaliation claim. *Zann Kwan*, 737 F.3d at 845 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 348 (2013)).

### 2. *Prima Facie* Case

The parties do not appear to contest that Champion has fulfilled the second and third elements of the *prima facie* test. However, the parties dispute whether Champion engaged in protected activity, and whether there is a casual connection between that activity and Parks' failure to promote her in 2016 or 2017.

#### a. Protected Activity

Protected activity "refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (internal quotation marks omitted), *superseded by regulation on other grounds as stated in Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019). Such activity can be either formal, such as the filing of formal discrimination charges, or informal, such as "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges." *Matima v. Celli*, 228 F.3d 68, 78–79 (2d Cir. 2000) (internal quotations omitted).

Champion asserts that four sets of activities of hers were protected: (1) her comments during the 2014 RCM1 interview that women had not been promoted in the Athletics Department at Riverbank, *see* Parks 56.1 ¶ 95; Champion 56.1 ¶ 95; (2) her complaints to Matson, during the telephone call following Champion's rejection for the 2016 RCM2 position, about discrimination against women at Parks. Parks 56.1 ¶ 98; Champion 56.1 ¶ 98; (3) her comments, in an email to Gonzalez, requesting access to her personal-history file to verify that nothing was "intentionally misconstrued to prevent [her] growth as a female employee while applying for upgrades in the park system[.]" Parks 56.1 ¶ 99; and (4) her comments during the

March 2017 RCM1 interview that women were not being promoted at Parks and "that needs to change[,]" Parks 56.1 ¶ 101; Champion 56.1 ¶ 101.  Parks disputes the character and content of a number of these statements.  But, viewing the evidence in the light most favorable to Champion, each of her complaints could be fairly viewed as a complaint of discrimination against women, made to either a supervisor or an individual in a position of power with respect to Champion, *i.e.*, an interviewer.  With Champion's having served a long career at Parks and been denied several promotions, a finder of fact could conclude that she made each of these complaints harboring the subjective belief that persons at Parks had discriminated against her.

However, subjective, good faith belief alone is not sufficient.  To sustain a retaliation claim, Champion must have an objectively reasonable belief that she was engaged in protected activity.  *See Johnson v. City Univ. of N.Y.*, 48 F. Supp. 3d 572, 577 (S.D.N.Y. 2014) (quoting *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 17 (2d Cir. 2013)).

On the summary judgment record, Champion's claims that unlawful discrimination was preventing women from being promoted to leadership positions at Parks were not objectively reasonable.  As explained, within Riverbank Athletics, a woman held an RCM1 position from 1995 to 2011.  Lee Decl. ¶ 29.  And only two RCM1 positions have opened up between 2011 and June 2018, in both of which a man was selected over Champion.  These facts provide too few data points on which a reasonable person could find gender discrimination in promotions at Riverbank Athletics.  That is particularly so given the undisputed record of promotions within Parks of women in other units that are also subject to the multi-level promotion process.  Indeed, it is undisputed that, between 2000 and 2014, six women have been promoted to "managerial or supervisory" positions, *i.e.* Grade 12 or higher, outside of Athletics: "(1) Tracey Townes in 2000 and 2004; (2) Lila Acevedo in 2006; (3) Wilda Gonzalez in 2007; (4) Tamika Ortiz in 2007;

(5) Ruth Thomas in 2005 and 2007; and (6) Shaire Trafton in 2015." Parks 56.1 ¶ 20; *see also* Champion 56.1 ¶ 20 (conceding only that these promotions occurred). In addition, Ana Feliz, formerly Grade 12, was promoted in the New York City Regional Office in 2007. Parks 56.1 ¶ 20; *see also* Champion 56.1 ¶ 20 (conceding only that this promotion and the preceding promotions occurred).

For this reason, Champion's retaliation claims fail to make out a *prima facie* case.

### b.   *Causal Connection*

Champion's comments made in 2016 and 2017 occurred sufficiently close in time to the denial of promotions to permit an inference of retaliation. Her comments in December 2016 took place three months before her March 2017 interview for the RCM1 position at Riverbank Athletics in March 2017, and Champion's 2017 comments were made during the interview itself.

The same, however, cannot be said regarding her 2014 comments. Even if Champion could establish that her comments constitute protected activity, her claim—to the extent based on her 2014 comments—would not establish the causal connection required to make out a *prima facie* case.

Causal connection can be demonstrated either "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant," or "indirectly, by showing that the protected activity was followed closely by the discriminatory treatment." *Hicks*, 593 F.3d at 170 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). Temporal proximity is sufficient for *prima facie* causation. *See Zann Kwan*, 737 F.3d at 845.

Champion has not identified any direct evidence of a causal connection between any of her four sets of comments and adverse employment action. Rather, she relies on the temporal proximity between her comments and Parks' decisions not to promote her. But Champion's comments during the 2014 RCM1 interview are simply too remote in time from the earliest of

36

Parks' adverse actions—its decision not to promote her to the 2016 RCM2 position.  In this Circuit, although there are no bright-line rules establishing the limits beyond which temporal proximity will fail to give rise to a causal inference, a two-year gap, without more, is clearly too long.  *See Gorzynski*, 596 F.3d at 110 (five-month gap is not necessarily too long for temporal proximity); *Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 457 (S.D.N.Y. 2012) (three- to six-month gap standing alone is insufficient to establish causal connection); *Lioi v. N.Y.C. Dep't of Health & Mental Hygiene*, 914 F. Supp. 2d 567, 592 (S.D.N.Y. 2012) (10-month gap is insufficient to establish causal connection).

Here, although Matson testified that he remembered these comments prior to Reid's and Perez's nominations, his affirmative recollection of these remarks is alone insufficient evidence to establish, as Champion claims, that Matson was "lying in wait" to disadvantage her and then did so in 2016.  Champion Opp. at 23.  Notably, Champion has not identified any admissible evidence—emails, contemporaneous verbal statements, post-hoc testimony—to support the notion that Matson harbored a continuing animus towards Champion and was waiting during the intervening two years for an opportunity to retaliate.

### 3.   But-For Causation

Even if Champion were able to satisfy each element of a *prima facie* case, she has not adduced evidence on which a jury could find, other than by speculation, that her comments were the but-for cause of the denial of her 2016 and 2017 promotions.  Significantly, the legitimate, non-discriminatory reasons that Parks promoted Perez and Gomez, *see supra* at 21–24, apply equally to her retaliation claims.  And Champion cannot establish that her comments, as opposed to Parks' legitimate reasons for promoting a competing candidate, were the but-for cause of these decisions.

Critical here, temporal proximity alone can support a causal connection at the *prima facie* stage, but it is "insufficient to defeat summary judgment at the pretext stage." *Zann Kwan*, 737 F.3d at 847.  And with discovery complete, Champion has not come forward with any direct or circumstantial evidence that any of her complaints prompted any of the participants within Parks in these decisions to promote Perez or Gomez over her.  The closest Champion comes is a December 9, 2016 email from Doherty to Rodriguez regarding the 2016 RCM2 position.  *See* Doherty Email.  Doherty there recounts a discussion that he had with "Joe" after "Joe" saw Doherty speaking with both Champion and Perez.  *Id.*  Doherty recounts that "Joe" "joked that [Doherty] was helping the competition and [Doherty] joked that the champ has nothing to worry about."  *Id.*  Doherty states that "Joe" replied "I don't know Kim did a nice job and stood out in the training class at RBSP."  *Id.*  Champion posits that, as used in this email, "Joe" is Joseph Lescinski, "the champ" is Scott Matson, and "the competition" is Champion.  But even crediting this interpretation—and Champion does not cite deposition testimony from any person on this email chain decoding it—she does not offer any basis to construe this email as reflecting retaliatory animus by anyone against Champion for her protected statements.  Champion Opp. at 1.  Quite the contrary, Doherty quotes "Joe" as stating that "Kim really did a nice job and stood out in the training class at RSBP."  *See* Doherty Email.  Champion has not adduced any other evidence that her statements of concern about the promotion of women within Parks animated the denial of her 2016 or 2017 promotion applications.

For these reasons, the Court grants Parks' motion for summary judgment with respect to Champion's retaliation claims.

## CONCLUSION

For the foregoing reasons, the Court grants Parks' motion for summary judgment.  The Clerk of Court is respectfully directed to terminate the motions pending at dockets 64 and 90 and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: November 4, 2020
        New York, New York